**Carol WYKE, Plaintiff,**

v.

**POLK COUNTY SCHOOL BOARD, Defendant.**

No. 91–1457–Civ–T–24C.

United States District Court,
M.D. Florida,
Tampa Division.

May 15, 1995.

Clay Booth Rood, Law Office of Clay Rood, Tampa, FL, for plaintiff Carol Wyke.

Mitchell Dean Franks, Lane, Trohn, Clarke, Bertrand, Vreeland & Jacobsen, P.A., Lakeland, FL, Dabney Loy Conner, Wofford H. Stidham, Lane, Trohn, Clarke, Bertrand, Vreeland & Jacobsen, P.A., Bartow, FL, for defendants Polk County School Board, Max Linton and James Butler.

## MEMORANDUM OPINION

JENKINS, United States Magistrate Judge.

Before the court is defendant's Rule 50, Fed.R.Civ.P. motion which was granted during trial on May 8, 1995 at the close of all of the evidence on the federal claim. This court enters the following findings of fact and conclusions of law on this issue.[1]

Plaintiff filed this section 1983 and pendent state wrongful death action against Polk County School Board, the principal of McLaughlin Junior High School (Max Linton) and the vice-principal (James Butler). Trial in this case commenced on May 1, 1995. During plaintiff's case-in-chief, plaintiff voluntarily moved to dismiss the complaint against defendants Max Linton and James Butler which this court granted. (Dkt. 119).

This case went to the jury solely on the pendent state claim of negligence. The jury returned a verdict in favor of the plaintiff, apportioning liability between defendant School Board, Helen Schmidt and Carol Wyke.

Plaintiff alleges in Count I that defendant Polk County School Board violated her federal civil rights while acting under color of state law relying primarily upon *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Plaintiff contends that she has a fundamental liberty interest in maintaining the care, custody, management, companionship and society of her son Shawn David Wyke under the Due Process Clause of the First and Fourteenth Amendments.

Plaintiff claims that defendant Polk County School Boards's failure to implement policies and procedures regarding suicide prevention/intervention was likely to result in the violation of constitutional rights and rose to the level of deliberate indifference to plaintiff's constitutional rights. In addition, plaintiff claims that defendant Polk County School Board's failure to train or supervise its personnel with respect to suicide prevention/intervention constituted deliberate indifference and was likely to result in the violation of constitutional rights. According to plaintiff, defendant's deliberate indifference increased the likelihood that Shawn Wyke would commit suicide and directly and proximately resulted in his suicide and the deprivation of plaintiff's constitutional rights.

## I. EVIDENCE AT TRIAL

Plaintiff's thirteen-year old son, Shawn David Wyke, committed suicide on the evening of October 17, 1989 at his residence. Shawn was a student at McLaughlin Middle School located in Polk County, Florida. Plaintiff called several witnesses to establish that McLaughlin administrators had knowledge of two suicide attempts by Shawn at the school the day before his suicide.

Brenda Morton testified that her son, Jonathan, came home from school on October 16 and told her that he walked into a bathroom at the school and found Shawn trying to hang himself with his football jersey. Morton did not know Carol Wyke well enough to call her so she called McLaughlin and talked to a man whose voice she recognized as Jim Bryant, the Dean of Students. She told him what Jonathan told her and he said he would "take care of it". Morton testified that she would have called Shawn's mother if she had known that Bryant was not going to do anything.

Detective Robert C. Ore of the Polk County Sheriff's Department received a phone call from someone at McLaughlin shortly after Shawn's death. When he returned the call he learned that the school knew of a suicide attempt by Shawn. Deputy Ore inferred from the conversation that the school had known about the attempt before Shawn died, rather than learning about it later. Deputy Ore did not recall the name of the person he spoke with at the school.

Marlene Robertson, a school custodian, testified that she had worked at McLaughlin for about 10 years. She had knowledge of one student saying he was going to kill himself. She did not recall the date, but did recall hearing that a student committed sui-

---

1. The parties have consented to proceed before the Magistrate Judge pursuant to Title 28, United States Code, Section 636(c) and Fed.R.Civ.P. 73.

cide the following day or a couple of days after she had this encounter. During lunchtime, Robertson encountered this student and he told her he was going to commit suicide because he was having problems with his grandmother. She then looked in the bathroom he had exited from and found a coat hanger and cord hanging from the ceiling. She threw it in the trash and went into the cafeteria. She saw James Butler, Vice Principal, and told him that a boy was talking about killing himself. She pointed to a group of boys. She did not tell Butler about finding the coat hanger and cord in the bathroom. Robertson testified that Butler told her to return to her work. She did not know the student by name but described him as a white youth, skinny, and about her height (5 feet, 2 inches). Robertson was shown a yearbook photograph of Shawn Wyke and could not say whether he was the student she encountered.

Plaintiff testified that when she returned to the school a couple of weeks after Shawn's death she met with James Bryant, the Dean of Students. Wyke told Bryant she had heard some rumors that the school might know something. She testified that Bryant related the following: Bryant told her he did not feel "guilty" about Shawn's death although he had counseled Shawn the day before at school when someone told him Shawn was in the bathroom; Bryant told her that he got Shawn out of the bathroom and that Shawn was upset; Bryant stated that he read some Bible verses to Shawn and that he thought Shawn seemed to feel better; he never thought that Shawn would commit suicide; he did not tell the principal because it was "too much red tape" and he thought he had the situation under control.

Bryant denied having any knowledge of a suicide attempt by Shawn or telling Wyke about any counseling effort. He stated that he had received training in dealing with suicidal students while working at another Polk County public school for students with disciplinary problems.

Vice-principal Butler also testified that he had no knowledge of any suicide attempts by Shawn and did not have a conversation with Marlene Robertson about a suicidal student.

Butler has experience and training in guidance counseling. He has had dealings with two suicidal students in the past. In both cases, he brought the student into his office, called the parents, and referred them for counseling services.

Carol Wyke and Helen Schmidt, whose home Shawn was residing in at his death, testified that Shawn was well liked and seemed happy at school. Schmidt befriended Wyke and her son when they moved to Florida. Shawn and Wyke referred to Schmidt as Shawn's "grandmother" and she was listed on his emergency card at school.

As a single mother, Wyke grew to depend on Schmidt to help care for Shawn because Wyke was both working and going to school. According to Wyke, there were conflicts between them about raising Shawn and other matters, including use of a car. About two weeks before Shawn's death, Wyke moved into a hotel/apartment with the intention to have Shawn move in with her as soon as she could earn some more money. Schmidt testified that both she and Wyke were concerned about some anger Shawn was experiencing. Schmidt had made an appointment for Shawn to see a mental health counselor, but Shawn's death occurred before the scheduled appointment. She stated that Wyke had considered getting counseling for Shawn at an earlier date but no appointment was ever made. Neither Wyke nor Schmidt were ever notified by school employees about any suicidal attempts by Shawn.

Plaintiff called several experts in the field of suicide prevention who testified about the need for suicide prevention training in public schools. These witnesses testified that the Polk County School Board provided inadequate training for school-based administrators and teachers. An adequate training program would involve mandatory written policies requiring (1) parental notification of any student who attempted suicide at school; (2) holding the student in protective custody until the parents arrived; and (3) arranging for counseling services. This testimony indicated that without training, school employees tend to underestimate the "lethality" of suicidal thoughts, statements, or suicidal attempts.

Plaintiff's expert witnesses also testified that if school board employees had been adequately trained in suicide prevention, Shawn would have not committed suicide on October 17, 1989. Two psychologists called by plaintiff testified that a suicide attempt by an adolescent is a "cry for help" which, if ignored, increases the likelihood of suicide.

Polk County School Board did not have the type of training program described by plaintiff's experts in place at the time of Shawn's death. However, in the mid to late 1980's, information concerning the warning signs of suicide, how to handle suicidal students, information about community resources, and other information was provided to counselors and school psychologists at each school by Polk County School Board staff for distribution to teacher and other staff as appropriate. Also, "care teams" were in place at each school to address various student needs, including mental health counseling. The Board also provided a crisis team to go into a school when a death occurred due to any cause. In the two years preceding Shawn's death, only one Polk County public school student, a high school student, was known to have committed suicide.

## II. DISMISSAL OF FEDERAL CLAIM

■ Defendant moved for a directed verdict prior to completion of plaintiff's case and again at the close of their case. *See* Rule 50, Fed.R.Civ.P. The court granted the motion as to the federal claim, after hearing all of the evidence presented by the parties, for the reasons discussed below.[2]

A Rule 50 motion, or motion for directed verdict, should be granted "if, viewing the evidence as a whole and drawing all reasonable inferences in favor of the nonmoving party, no reasonable juror could reach a contrary verdict." *Williams v. United States,* 931 F.2d 805, 809 (11th Cir.1991) (citations omitted), *modified on other grounds,* 939 F.2d 915 (11th Cir.1991).

■ To proceed on a section 1983 claim plaintiff must establish as a threshold matter that the harm was caused by a violation of a constitutional right. *See Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 120, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992); *Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d 1030, 1032 (11th Cir.1987).

Plaintiff alleges that her First Amendment freedom of association rights were violated by defendant's conduct. Plaintiff has a constitutionally protected liberty interest in her relationship with her son Shawn. *See Trujillo v. Board of County Comm'rs,* 768 F.2d 1186 (10th Cir.1985); *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir.1984). *See generally Arnold v. Board of Educ. of Escambia County, Ala.,* 880 F.2d 305, 312–13 (11th Cir.1989). However, the familial right of association is protected by the liberty interest embodied in the substantive due process element of the Fourteenth Amendment. *See Griffin v. Strong,* 983 F.2d 1544, 1546–47 (10th Cir.1993). The United States Supreme Court has distinguished freedom of intimate association, which is protected as a fundamental personal liberty interest, from freedom of expressive association, which is protected by the First Amendment. *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984). Therefore, plaintiff's alleged constitutional violation should be analyzed under the substantive due process clause of the Fourteenth Amendment, and not the First Amendment.

Viewing the evidence in the light most favorable to plaintiff, her Fourteenth Amendment due process claim cannot overcome the hurdle presented by *DeShaney v. Winnebago County Dep't of Social Serv.,* 489 U.S. 189, 197, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989). In *DeShaney,* the father of four-year-old Joshua DeShaney beat him so severely that he suffered permanent brain damage and was rendered profoundly retarded. The respondents were social workers and local officials who were aware that Joshua was being abused by his father. Local authorities and the Department of Social

Services were aware that Joshua was being abused as early as January 1982, more than two years before Joshua's father beat him so severely that he fell into a life threatening coma.

Joshua DeShaney and his mother sued under section 1983 claiming that the failure to act to protect Joshua against his father's violence, i.e., remove Joshua from his father's custody, violated his substantive due process rights under the Fourteenth Amendment. The district court granted summary judgment in favor of respondents which the appellate court affirmed.[3]

The Court held that a state's failure to protect an individual against private violence does not constitute a violation of the substantive Due Process Clause. *Id.* at 201–02, 109 S.Ct. at 1006–07. Because a state is not required under the Due Process Clause to provide its citizens with "particular protective services," the Court held that a state cannot be liable for injuries that could have been avoided had it chosen to provide the services.

The Court went on to reject petitioners' argument that the state created or assumed a "special relationship" with Joshua which created a duty to protect him from danger. The Court, citing *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), explained that such a duty arises only when the state takes a person into custody which renders the individual unable to care for himself. "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.,* 489 U.S. at 201, 109 S.Ct. at 1006. Accordingly, the Court affirmed summary judgment for respondents. *See also Gazette v. City of Pontiac,* 41 F.3d 1061 (6th Cir.1994) (no special relationship or section 1983 liability for death and kidnapping victim despite police lies to family); *Jones v. City of Carlisle, Ky.,* 3 F.3d 945 (6th Cir.1993) (plaintiff injured by epileptic driver alleged

City aware of danger but took no action; claim dismissed under *DeShaney* because no special relationship and, therefore, no constitutional injury), *cert. denied,* —— U.S. ——, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994).

■ Here, plaintiff has alleged that a "special relationship" existed creating a constitutional duty on defendant to protect Shawn Wyke from committing suicide. In order to create a special relationship which imposes an affirmative duty on the state to protect an individual, the state must restrain the individual's freedom. *See generally Wooten v. Campbell,* 49 F.3d 696 (11th Cir.1995) (no substantive due process claim where father abducted and killed son during unsupervised visitation although son in legal custody of state agency at time of incident). Shawn committed suicide in the evening at his home. He had returned to the supervision of Helen Schmidt. It was Carol Wyke and Helen Schmidt who had ultimate control and upon whom Shawn depended for his basic needs.

Although not yet addressed by the Eleventh Circuit, other circuits hold that mandatory/compulsory school attendance does not create a special relationship between schools and students. *See Wright v. Lovin,* 32 F.3d 538, 540 (11th Cir.1994) (citations omitted). The special relationship exception is extremely narrow. *Id.* at 541. It is not supported by the facts of this case. Because no special relationship existed between Shawn Wyke and the School Board, defendant had no legal obligation to prevent harm.

Plaintiff attempts to distinguish *DeShaney* on its facts, arguing that the state was not passive in the instant case as it was in the *DeShaney* case. This argument is without merit. As in *DeShaney,* "the most that can be said of the state functionaries [the school board] in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *DeShaney,* 489 U.S. at 203, 109 S.Ct. at 1007. In *DeShaney* the state actors were aware of the abuse and at one point had Joshua in their custody. Several individuals reported

---

**3.** In this case defendant's motion to dismiss was denied by the District Judge but no motion for summary judgment was ever filed.

suspected abuse to the authorities and relied upon those authorities to take action. Similarly, accepting all plaintiff's allegations as true, the school board was aware of Shawn's attempted suicides but did not respond appropriately. In both situations, a private individual over whom the state actors had no control caused the harm. In one case the father caused the harm by inflicting severe beatings upon Joshua. Here, Shawn died by his own hand when he committed suicide. On the facts of the instant case, *DeShaney* is controlling.

■ Even assuming that a special relationship existed under the circumstances of this case, the defendant's actions did not rise to the level of deliberate indifference when viewing all of the evidence in plaintiff's favor.

Plaintiff seeks to hold the School Board liable under a "failure to train" theory articulated in *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Before municipal liability can attach under *Monell's* [4] policy or custom requirement, the failure to train must amount to "deliberate indifference" to the rights of plaintiff. *Id.* at 388, 109 S.Ct. at 1204. The issue is whether the "training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'" *Id.* at 390, 109 S.Ct. at 1205. If "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need [for training]. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.*

Municipal liability in failure to train case arises only where the need for such training is "plainly obvious to Department decision makers." *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir.1990). If the final policy making official had no actual notice of unconstitutional practices by the defendants, and there

is no evidence of a history of widespread prior abuse by department personnel that would have put the policymaker on notice of the need for improved training or supervision, then there can be no liability for failure to train. *See id.* The Supreme Court has noted that deliberate indifference means more than ordinary negligence and probably more than gross negligence. *Canton*, 489 U.S. at 388 n. 7, 109 S.Ct. at 1204 n. 7.

Brenda Morton testified that she called the school on the evening of October 16, 1989 and spoke to a man she believed was James Bryant, Dean of Students. Morton indicated that she informed the man of Shawn's suicide attempt at school earlier that day. However, Bryant testified that he had no knowledge of any suicide attempts by Shawn. Carol Wyke testified that she talked to Bryant a week or so after Shawn's death and he told her that he had talked with and counseled Shawn on October 16, 1989.

Marlene Robertson testified that a student told her that he was going to commit suicide because of problems he was having with his grandmother. She also indicated that when she went into the bathroom the boy had exited from she observed a coat hanger and cord hanging from the ceiling which she threw away. She did not relay this information to school administrators. Robertson testified that she told vice-president Butler that a boy was talking about killing himself and then pointed to a group of students. At trial, Robertson could not identify Shawn as the student she had talked to that day. Butler testified that he had no knowledge of any suicide attempt by Shawn and that he had no conversation with Robertson about a suicidal student.

Assuming that McLaughlin administrators were aware of one or more prior suicide attempts by Shawn and that defendant inadequately trained its personnel in suicide prevention, defendant's conduct was at most negligent and did not rise to the level of "reckless indifference" concerning the need for training required under the second prong of *Canton*. Moreover, plaintiff presented no evidence that such suicide attempts had occurred on school grounds prior to October 16,

4. *Monell v. Dep't of Social Serv. of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

1989, or that there was a pattern of suicide threats or attempts of which the School Board was aware. Instead, defendant presented evidence that only one suicide had occurred during the two years prior to Shawn's death.

Based on the foregoing, the need for training in suicide prevention/intervention was not plainly obvious to the School Board.[5] Further, defendant was not on notice of unconstitutional practices in regard to suicide prevention/intervention. Therefore, plaintiff's section 1983 claim brought under the failure to train theory espoused in *Canton*, does not survive defendant's motion for directed verdict. *See Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1397–98 (11th Cir.1994) (holding that failure to train officers in the handling of suicidal inmates does not amount to deliberate indifference of decedent's constitutional rights when deciding the issue of qualified immunity).

This case, like *DeShaney*, is very tragic. However, the School Board had no constitutional duty to protect Shawn Wyke from himself and the failure to do so does not constitute a violation of the Due Process Clause for which the Polk County School Board may be held liable. For these reasons, no reasonable juror could find in favor of plaintiff on her federal constitutional claim and defendant is entitled to judgment as a matter of law on Count I under Rule 50(a), Fed.R.Civ.P.

**DONE and ORDERED.**

---

**5.** In the early 1980's, the Florida legislature recognized that youth suicide was a primary concern in this state. Chapter 84–317 §§ 24–26, Laws of Florida (The Florida Youth Emotional Development and Suicide Prevention Act). However, the parties concede that this Act did not impose upon school boards a legal duty to develop suicide prevention/intervention programs.