Donnie Lee BAKER, et al., Plaintiffs,

v.

CLAY COUNTY BOARD OF EDUCATION, et al., Defendants.

Civ. A. No. 93–131.

United States District Court, E.D. Kentucky, London Division.

Dec. 8, 1994.

---

Samuel E. Davies, Barbourville, KY and Annette Morgan, Manchester, KY, for plaintiffs and executors plaintiffs.

Neville Smith, Smith & Wells, Manchester, KY, John G. Prather, Jr., Somerset, KY, and Arthur L. Brooks, Brooks & Fitzpatrick, Lexington, KY, for defendant and official defendants.

### OPINION AND ORDER

BERTELSMAN, Chief Judge:

### I. INTRODUCTION

This is a civil rights action, pursuant to 42 U.S.C. § 1983, to recover damages for the death of Donald Scott Baker (hereinafter referred to as "Scotty"), a minor. Plaintiffs also assert supplemental state law claims. The action was filed against Charlotte H. Smith, the school secretary who released Scotty into the hands of his stepmother and an accomplice who murdered him. Various officers of the Clay County School District, individually and in their official capacities, together with the Clay County Board of Education, are also defendants. This court previously concluded that the individual defendants are entitled to qualified immunity and dismissed the § 1983 claims against them individually. This matter is presently before the court on the motion of the remaining defendants for summary judgment (Doc. # 41).

### II. FACTUAL BACKGROUND [1]

On November 25, 1992 at 11:20 a.m., Suzanne Renee Baker [2] entered Paces Creek Elementary School and informed Charlotte Smith, the school secretary, that she wanted to pick up Scotty Baker. Scotty, who was ten years old, was a student at the school. Ms. Smith noticed that the woman was wearing a wig, but she did not become suspicious because many women in the community wear wigs. Ms. Smith asked whether Suzanne Baker had come to eat lunch with Scotty because the school was having a Thanksgiving lunch to which parents and other relatives had been invited. Suzanne Baker informed Ms. Smith that she was there to take Scotty to see his father. Ms. Smith then told her to complete the sign-out form. In completing the form, Suzanne Baker used the alias "Patricia Smith."

Just as Suzanne Baker completed the form, she spotted Scotty in the hallway. Ms. Smith went to the hall and told Scotty that the other woman was there to pick him up. Suzanne Baker then leaned into the hallway and told Scotty that she was to take him to see his father. Ms. Smith did not ask for any identification because Scotty seemed to know Suzanne Baker, and Suzanne Baker had completed the sign-out form indicating

---

1. In ruling on this motion for summary judgment, the court has construed the facts in the light most favorable to the nonmoving party.

2. Suzanne Renee Baker and Scotty Baker were unrelated.

she was a cousin to Scotty's father. When Ms. Smith asked Scotty if he would rather eat before he left, Scotty indicated to her that he would prefer to leave with Suzanne Baker, rather than stay and eat his special Thanksgiving lunch. Ms. Smith then sent Scotty to get his things while "Patricia Smith" waited in the hall. That was the last time Ms. Smith saw him.

Scotty was found dead on December 2, 1992. His stepmother, Stephanie Baker, and Suzanne Renee Baker, the accomplice who picked Scotty up at school, were charged with his murder. An indictment was returned on December 18, 1992.[3]

During the criminal trial, Ms. Smith first learned that Ruth Baker, Scotty's natural mother, had completed a release form specifying the persons authorized to remove Scotty from school. Ms. Smith was previously unaware of the form because Scotty's teacher maintained sole possession of it. Paces Creek Elementary had an extended school services program for students who needed extra help; the form identified the individuals permitted to take Scotty home from this program. Ms. Smith was not involved with the extended services program and was, therefore, unaware that such forms were completed.

Prior to this incident, the Clay County Board of Education had adopted a policy, identified as policy number 700.09, which stated, "It is the policy of the Clay County Board of Education that permission to leave the school must be secured from the school principal's office." The Board's "Code of Conduct" also reflected this policy, but the Board never formally adopted the language in the "Code of Conduct" as a policy of the Board.

The "Code of Conduct," among other things, contained the following language regarding removing students from school:

"We recognize the need for students to leave school at times during the day. On the day a student needs to check out during the school [sic] the parent/guardian should call the school. However, if the school has not been called, the par-

ent/guardian must come to the school and obtain permission for the student to leave. Elementary school students will only be given permission to leave school with the parent/guardian or a designated person.

\* \* \* \* \* \*

The parent or student will complete a sign-out form before the student is permitted to leave school."

This handbook was subsequently sent to the State for approval. Once approved, the School Board distributed the handbook to all students.

In November 1992, Paces Creek maintained a sign-out list which recorded the child's name, the person taking the child, the person's relationship to the child, and the time the child was removed from school. Normally, parents, guardians, or a designated person could consent to the removal of a child from school either by note or through a telephone call. On the occasions where Ms. Smith had been directed not to release a child, she would hold the child in the office and the principal would speak to the person who had come for the child. Primarily, this occurred during and after divorces when custody battles arose between parents.

Ms. Smith noted that she could not know who was authorized to remove a child from school unless she had been notified. She further stated that no identification process, apart from the sign-out list, existed to verify that the individual removing the child was authorized to do so. The school posted signs stating that all visitors were to check in at the office, but no other guidelines or policies existed concerning the presence of strangers in the school. If a stranger entered the school, Ms. Smith would approach the stranger and inquire as to his or her business.

Ms. Smith received no instruction or guidance concerning the way in which she should determine whether a person was authorized to pick up a child, how to identify the person requesting the child, or what to do if she suspected an unauthorized person was attempting to take the child. Ms. Smith used

---

**3.** Laurel Circuit Court Criminal Action Nos. 92– 226 and 92–227.

her own judgment, and if she believed a problem existed she would call the principal for assistance. Ms. Smith admitted that she had never read the "Code of Conduct," nor had she been instructed to do so.

Plaintiffs argue that defendants violated Scotty Baker's substantive due process rights by failing to establish sufficient policies or to administer adequate training to protect students from being removed from school for improper purposes. Plaintiffs allege that, because Kentucky state law requires students to attend school, the students are in the custody of the state and, therefore, a "special relationship" arises accompanied by a corresponding duty to protect the child.

Defendants contend that no constitutional violation occurred and, therefore, no liability may be imposed against them. Specifically, they assert that no "special relationship" exists, and no corresponding duty to protect arises.

### III. ANALYSIS

Plaintiffs encounter two insuperable barriers in attempting to establish § 1983 liability against the school district.

■ The first is the doctrine of *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 197, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989), that a state's failure to protect an individual against private violence simply does not constitute a violation of the right to substantive due process. It is only when the state takes a person into its custody and holds him there against his will that the Constitution imposes upon the state a duty to assume some responsibility for his safety and general well being. *Id.* at 199–200, 109 S.Ct. at 1005–06. *See* discussion in *Chipman v. City of Florence*, 858 F.Supp. 87 (E.D.Ky.1994).

■ Plaintiffs argue that their decedent was in effect "in custody" within the rule of *DeShaney* because he was required to be present in school by the state's compulsory attendance statutes. They contend that compulsory attendance creates a "special rela-

tionship" between a student and the public school system.

The great weight of authority is to the contrary, however. *Graham v. Independent Sch. Dist. No. I–89*, 22 F.3d 991, 994–95 (10th Cir.1994); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir.1993); *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1368–73 (3d Cir.1992) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *J.O. v. Alton Community Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir.1990); *Russell v. Fannin County Sch. Dist.*, 784 F.Supp. 1576, 1582–83 (N.D.Ga.), *aff'd without opinion*, 981 F.2d 1263 (11th Cir.1992). These cases have held that compulsory school attendance laws do not create a special relationship between the students and the public school authority. Therefore, the first ground on which plaintiffs' case fails is that the school system owed no duty to their decedent to protect him from harm from a third party.

■ A second, but equally formidable barrier, arises from the recent decision of the United States Court of Appeals for the Sixth Circuit in *Lewellen v. Metropolitan Government of Nashville and Davidson County*, 34 F.3d 345 (6th Cir.1994). There, the court held that *Nishiyama v. Dickson County*, 814 F.2d 277 (6th Cir.1987) (en banc), on which plaintiffs here heavily rely, is no longer good law. *Id.* at 350.

*Nishiyama* had held that proof of gross negligence on the part of the defendant was sufficient to establish liability for a violation of substantive due process. *Id.* at 349. Reconsidering the issue, however, the *Lewellen* court held that an intervening Supreme Court case[4] had invalidated the holding of *Nishiyama*. *Id.* at 350.

In *Lewellen*, the plaintiff arguably was directly injured as a result of the gross negligence of a school district in requiring him to work directly under high tension lines. The Sixth Circuit held that gross negligence was insufficient to establish a constitutional violation. *Id.* at 351. Rather, the court held in language very appropriate here:

---

**4.** *Collins v. City of Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

"When all is said and done, this case, like *Harker Heights,* amounts to nothing more than a non-intentional tort case the facts of which give the plaintiff a strong claim on our sympathies. The Supreme Court has repeatedly declared its unwillingness to 'make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.' *See Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976); *Daniels v. Williams,* 474 U.S. [327] at 332, 106 S.Ct. [662] at 665–66 [88 L.Ed.2d 662 (1986) ]; *Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981). The Supreme Court 'has always been reluctant to expand the concept of substantive due process,' guideposts in this uncharted area being 'scarce and open-ended.' *Harker Heights,* 503 U.S. at ——, 112 S.Ct. at 1068. The Court has been particularly reluctant to hold that the highly elastic notion of substantive due process should be stretched to the point of 'impos[ing] federal duties that are analogous to those traditionally imposed by state tort law.' *Id.* at ——, 112 S.Ct. at 1070 (citations omitted). *What seems to be required is an intentional infliction of injury,* as we suggested in *Wilson v. Beebe,* 770 F.2d [578] at 586 [ (6th Cir.1985) ], *or some other governmental action that is 'arbitrary in the constitutional sense.'* "

*Id.* (emphasis added).[5]

The case at bar *might* have presented a jury issue of gross negligence, but the court need not decide that difficult issue. The court does hold that the stringent standard of *Lewellen* is not met by the proof in this case.

Therefore, the plaintiffs having had a sufficient opportunity for discovery and two essential elements of their case being lacking, the motion for summary judgment for the defendants (Doc. # 41) must be, and it is, hereby GRANTED. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). A separate Judgment shall enter concurrently herewith.

The plaintiffs may have state claims against the defendants. Therefore, the state claims are dismissed without prejudice. 28 U.S.C. § 1367(c)(3).

### JUDGMENT

Pursuant to the Opinion and Order entered concurrently herewith,

**IT IS ORDERED AND ADJUDGED** that all federal claims herein be, and they are, hereby **dismissed,** with prejudice, and all state claims be, and they are, hereby **dismissed,** without prejudice, and that this matter be, and it is, hereby **stricken from the docket of this court,** costs to be recovered by the defendants.

---

**5.** The reader is referred to the *Lewellen* opinion for an extensive discussion.