**Mohammad Rankouhi MOMENNIA, Petitioner,**

v.

**Anne ESTRADA, District Director, Bureau of Immigration and Customs Enforcement, et al., Respondents.**

No. 3–03–CV–0525–BD.

United States District Court,
N.D. Texas,
Dallas Division.

June 25, 2003.

Karen H. Pennington, Law Office of Karen H. Pennington, Dallas, TX, for Petitioner.

Katherine Savers McGovern, Assistant United States Attorney, Dallas, TX, for Respondents.

### MEMORANDUM OPINION AND ORDER

KAPLAN, United States Magistrate Judge.

Petitioner Mohammad Rankouhi Momennia has filed an application for writ of habeas corpus pursuant to 28 U.S.C. § 2241. For the reasons stated herein, the application is denied.

### I.

Petitioner, a citizen and national of Iran, entered the United States as an immigrant

on July 16, 1983 and subsequently obtained lawful permanent resident status. (Resp. Opp'n to TRO, Exh. 4). On March 11, 1993, petitioner was convicted by an Oklahoma state court of second degree robbery, assault and battery, and pointing a firearm. (*Id.*). The trial court imposed concurrent prison sentences of 10 years on the robbery charge, 90 days on the assault and battery charge, and five years on the firearm charge, with all but the first five years suspended. (*Id.*, Exh. 2). Based on those convictions, the former Immigration and Naturalization Service ("INS") initiated removal proceedings. (*Id.*, Exh. 4).[1] At a deportation hearing held on September 3, 1997, petitioner was ordered removed to Iran and released on bond pending execution of the removal order. (*Id.*, Exh. 5). No appeal was taken to the Bureau of Immigration Appeals ("BIA"). Instead, petitioner filed a motion to reopen the deportation proceedings before the immigration judge. (*Id.*, Exh. 6). The motion was denied on November 10, 1997. (*Id.*, Exh. 7).

On December 7, 1998, petitioner filed an application for writ of habeas corpus in Oklahoma federal district court. (*Id.*, Exh. 8). As one of his grounds for relief, petitioner alleged that he received ineffective assistance of counsel at his deportation hearing. According to petitioner:

> The basis for the Petitioner's claim is that his attorney failed to inform the court that the Petitioner had assisted the Federal Government in its efforts to solve a bombing. This act was against members of the Petitioner's own country, and as a result he faces great danger or even death if he is forced to return to his native country.
>
> The threat to the Petitioner's life is so real until at one point he was offered the witness protection program. Therefore, had the attorney informed the court of the real and clear danger to the Petitioner's life he would not have received the adverse order of deportation.

(*Id.*, Exh. 8 at 2). The district court denied this claim, as well as petitioner's other challenges to the removal order,[2] noting that his conclusory assertions of ineffective assistance of counsel were insufficient to merit habeas relief. *Momennia v. I.N.S.*, No. CIV-98-1668-A, op. at 4 (W.D.Okla. May 10, 1999). Petitioner appealed this decision to the Tenth Circuit. In an unpublished opinion, the court held that petitioner's failure to raise his "numerous claims of incompetent representation" in an administrative appeal to the BIA de-

---

**1.** Section 237(a) of the Immigration and Nationality Act ("INA") provides, in relevant part:

> Any alien ... in and admitted to the United States shall, upon order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens:
>
> \* · \* \* \* \* \*
>
> — Any alien who is convicted of an aggravated felony at any time after admission is deportable.
>
> \* \* \* \* \* \*
>
> — Any alien who at any time after admission is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying

> ... any weapon, part, or accessory which is a firearm or destructive device (as defined in section 921(a) of Title 18) in violation of any law is deportable.

8 U.S.C. § 1227(a)(2)(A)(iii) & (a)(2)(C). The term "aggravated felony" as used in section 1227(a)(2)(A)(iii) includes a crime of violence, such as robbery, for which a term of imprisonment of five years or more was imposed. *See id.* § 1101(a)(43).

**2.** Petitioner also argued that he was denied due process because: (1) the immigration judge misapplied the law in determining his eligibility for deportation; and (2) his attorney erroneously advised him to waive his right to appeal the removal order. (Resp. Opp'n. to TRO, Exh. 8).

prived both the district court and the appellate court of subject matter jurisdiction. *Momennia v. I.N.S.*, No. 99–6210, op. at 3–4, 215 F.3d 1337 (10th Cir. Jun. 5, 2000).

On December 20, 2002, petitioner was taken into INS custody pending his removal to Iran. This prompted a second challenge to the removal order by way of habeas corpus. In the instant case, petitioner claims that his Fifth Amendment right to substantive due process was violated through a "state-created danger." More particularly, petitioner contends that shortly after the tragic events of September 11, 2001, the FBI asked him to infiltrate the Shiite Muslim community of Iranians and Iraqis in Oklahoma for the purpose of providing the agency with information and photographs regarding the activities of suspicious persons. At the time this request was made, petitioner alleges that the FBI knew he was subject to deportation at any time and would face great danger and "virtually certain death" upon his removal to Iran. Despite this danger, petitioner states that he offered substantial assistance to the government upon the reasonable belief that the FBI would intervene on his behalf to stop his deportation. (Hab. Pet. at 4–5, ¶¶ 14–16).

As part of his habeas application filed on March 11, 2003, petitioner sought a temporary restraining order and a preliminary injunction preventing his removal to Iran. The court denied injunctive relief,[3] but scheduled an expedited hearing and allowed petitioner to conduct limited discovery on his claims. At a hearing held on June 23, 2003, both sides were given an opportunity to call witnesses and present additional evidence in support of their respective positions. The issues have been fully briefed by the parties and this matter is ripe for determination.

## II.

 The due process clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amd. V. The substantive component of this clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992), *quoting Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). As a general rule, a government official has no constitutional duty to protect an individual from violent acts perpetrated by private parties. *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 197, 109 S.Ct. 998, 1004, 103 L.Ed.2d 249 (1989). However, this rule is not absolute. "When the state, through the affirmative exercise of its powers, acts to restrain an individual's freedom to act on his own behalf 'through incarceration, institutionalization, or other similar restraint of personal liberty,' the state creates a 'special relationship' between the individual and the state which imposes upon the state a constitutional duty to protect that individual from dangers, including, in certain circumstances, private violence." *McClendon v. City of Columbia*, 305 F.3d 314, 324 (5th Cir.2002) (en banc), *cert. denied*, —— U.S. ——, 123 S.Ct. 1355, 155 L.Ed.2d 196 (2003), *quoting*

---

**3.** In denying his request for a TRO, the district judge observed that most of petitioner's dealings with the FBI appeared to be voluntary. (TRO Hrg. Tr. at 37). However, the judge left open the possibility that petitioner may be entitled to habeas relief if he can prove that the FBI induced or coerced him into providing intelligence information on the Oklahoma Shiite Muslim community after September 11, 2001, knowing that he faced danger upon his removal to Iran. (*Id.* at 37–38).

*DeShaney,* 109 S.Ct. at 1006. The Fifth Circuit has recognized this "special relationship" exception to *DeShaney* in cases where a person is involuntarily confined or otherwise restrained against his will pursuant to a governmental order or by the affirmative exercise of state power. *See, e.g. Walton v. Alexander,* 44 F.3d 1297, 1299 (5th Cir.1995) (en banc).

■ A number of courts have suggested that the government may also have a constitutional duty to protect a person against injuries inflicted by a third-party when it affirmatively places the person in a position of danger the person would not otherwise have faced. *See, e.g. Butera v. District of Columbia,* 235 F.3d 637, 651 (D.C.Cir.2001); *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066–67 (6th Cir. 1998); *Kneipp v. Tedder,* 95 F.3d 1199, 1201 (3d Cir.1996); *Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir.1995), *cert. denied,* 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996); *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993); *Dwares v. City of New York,* 985 F.2d 94, 98–99 (2d Cir.1993); *Gregory v. City of Rogers, Arkansas,* 974 F.2d 1006, 1010 (8th Cir.1992), *cert. denied,* 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993); *Wood v. Ostrander,* 879 F.2d 583, 590 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990). This "state-created danger" exception to the *DeShaney* rule has neither been adopted nor rejected by the Fifth Circuit. *McClendon,* 305 F.3d at 325.[4] However,

the court has stated that in order to prove a substantive due process violation under this theory, a person must show, at a minimum, that: (1) government officials created or increased the danger to the person, and (2) acted with deliberate indifference. *Morin v. Moore,* 309 F.3d 316, 321–22 (5th Cir.2002), *reh'g denied,* 57 Fed.Appx. 213 (5th Cir.2003) (citing cases). To establish deliberate indifference, "the plaintiff must show that the [government] actors created a dangerous environment, that they knew it was dangerous, and that they 'used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur.'" *McKinney v. Irving Independent School Dist.,* 309 F.3d 308, 314 (5th Cir. 2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 1332, 154 L.Ed.2d 1030 (2003), *quoting Johnson v. Dallas Independent School Dist.,* 38 F.3d 198, 201 (5th Cir.1994), *cert. denied,* 514 U.S. 1017, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995). "The key to the state-created danger cases ... lies in the [government] actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id.* at 314, *quoting Johnson,* 38 F.3d at 201 (citation and internal quotations omitted).

### III.

Assuming *arguendo* that the Fifth Circuit would recognize the constitutional validity of petitioner's "state-created danger"

---

4. The original panel decision in *McClendon* noted that the Fifth Circuit has "explicitly adopted and enforced [the state-created danger] theory." *McClendon v. City of Columbia,* 258 F.3d 432, 436 (5th Cir.2001). However, a majority of the court disagreed with this observation on en banc reconsideration. *McClendon,* 305 F.3d at 325 ("[W]e have not yet determined whether a state official has a

similar duty to protect individuals from state-created dangers ..."). *See also Piotrowski v. City of Houston,* 237 F.3d 567, 584 (5th Cir.), *cert. denied,* 534 U.S. 820, 122 S.Ct. 53, 151 L.Ed.2d 23 (2001) (noting that this court has never adopted the "state-created danger" theory); *Randolph v. Cervantes,* 130 F.3d 727, 731 (5th Cir.1997), *cert. denied,* 525 U.S. 822, 119 S.Ct. 65, 142 L.Ed.2d 51 (1998) (same).

theory in the context of an immigration habeas case, the court must determine whether the FBI affirmatively placed petitioner in danger by coercing or inducing him to provide intelligence information on the Oklahoma Shiite Muslim community after September 11, 2001, and whether the agents involved acted with deliberate indifference.[5]

### A.

The facts and circumstances surrounding petitioner's involvement with the FBI were fully developed at the evidentiary hearing. Petitioner testified that he was initially contacted by Agent Charles Stern of the Oklahoma City FBI office in 1988. At that time, petitioner was a student at the University of Oklahoma and a member of the Muslim Student's Association ("MSA"), an organization comprised primarily of Farsi-speaking Iranians. Stern confronted petitioner with the fact that the name on his driver's license and passport did not match the name on his immigration documents.[6] Fearing repercussions as a result of this discrepancy, petitioner said that he reluctantly agreed to help the FBI monitor the activities of the MSA. Agent Stern gave petitioner two specific assignments. First, he asked petitioner to attend an M.S.A. § convention in Tulsa, Oklahoma and provide him with the license plate numbers of cars in the parking lot. Stern also sent petitioner to San Diego,

California to investigate suspected M.S.A. § involvement in a car bombing. Petitioner complied with both requests. In addition, he furnished Stern with regular reports on the activities of the M.S.A. § in Oklahoma City.

Sometime in 1989 or 1990, Stern told petitioner that the M.S.A. § had learned that he was cooperating with the FBI. As a result, petitioner could no longer be used as an informant. Although the FBI offered to relocate petitioner and his family under the Witness Protection Program, petitioner declined the offer because he did not believe the M.S.A. § would retaliate against him.

Petitioner had no further contact with Stern until 1998.[7] After his deportation hearing, petitioner called Stern to ask for help in preventing his removal to Iran. Stern, who by that time had been transferred from Oklahoma City to New York, told petitioner to call the local FBI office. Petitioner telephoned the Antiterrorism Section of the Oklahoma City FBI office and was directed to Special Agent Michael S. Puskas. However, Puskas offered no assistance at that time.

On September 12, 2001, the day after the terrorist attacks on the World Trade Center and the Pentagon, petitioner allegedly received a phone call from an unidentified FBI agent who inquired, "Do you want to come to our office or do you want

---

**5.** The court need not decide whether the Fifth Circuit would recognize the right of a criminal alien to prevent the execution of an otherwise valid removal order under a "state-created danger" theory because petitioner has failed to prove the elements of such a claim in any event. *See generally, Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 2267–68, 138 L.Ed.2d 772 (1997) (admonishing courts to exercise restraint when engaging in any expansion of substantive due process protections).

**6.** According to petitioner, he was admitted to the United States under his true name "Mohammad Rankouhi Momennia." However, his driver's license and passport were issued under the name "Mohammad Rankouhi."

**7.** Petitioner testified that an unidentified female FBI agent visited him in prison sometime in late 1993 or early 1994. The agent allegedly "demanded" information on terrorism or terrorist activities, but petitioner refused to cooperate unless the FBI agreed to help him overturn his conviction.

us to come to you." After speaking with a family friend and attorney, Frank Kirk, petitioner went to the local FBI office in Oklahoma City. Petitioner testified that he was intercepted in the parking lot by several agents who were awaiting his arrival. The agents immediately escorted him to an interview room in the FBI office where he met with Agent Puskas. At that meeting, petitioner said that Puskas asked him to provide information about the activities of the Muslim community "or we will make sure that you are deported." Petitioner felt he had no choice but to cooperate and agreed to help Puskas. Over the next 13 months, petitioner gathered information on the activities of Shiite Muslims in Oklahoma City for the FBI. In particular, he identified the speakers and topics discussed at meetings held at the Islamic Guidance Center and provided Puskas with a list of persons who attended the meetings. Petitioner also gave Puskas photographs of six or seven individuals who participated in events at the Center, including a pilot from Saudi Arabia. According to petitioner, he and Puskas met at various locations in and around Oklahoma City on at least 10 different occasions between September 2001 and October 2002. They also spoke regularly by phone. Petitioner testified that some of the contacts were initiated by him, while others were initiated by Puskas. At these meetings, petitioner alleges that he often sought assistance with his immigration case. At first, Puskas said it was "out of his hands." However, he later told petitioner that the FBI was working on some kind of "packet." Petitioner took this to mean that Puskas was preparing a packet of information for the INS documenting his assistance to the government.

Petitioner was arrested by federal agents on December 20, 2002 and placed in INS custody pending his removal to Iran. In April 2003, petitioner was transported to an immigration facility in Oakdale, Louisiana where he met with officials from the Iranian interest sector of the Pakistani consulate for the purpose of facilitating the issuance of travel documents to effect his removal. Petitioner testified that one of the Iranian officials who interviewed him was a former member of the M.S.A. § in Oklahoma City. At this interview, the official allegedly told petitioner that the government of Iran was aware that he had provided intelligence information to the FBI. This confirmed petitioner's fear of persecution, torture, and possibly even death if he is deported. Petitioner testified that he discussed the potential risks he faced upon deportation with Stern and Puskas, both of whom seemed to share his concern.

Two other witnesses testified at the evidentiary hearing about their dealings with the FBI on behalf of petitioner. Visar Belegu, a family friend, said that he spoke with Stern and Puskas after petitioner was arrested in December 2002. Both agents confirmed that petitioner had worked with the FBI in the past and seemed to acknowledge that he faced great danger if removed to Iran. Frank Kirk testified that petitioner called him on September 12, 2001, to ask if he should meet with the FBI at their request. After advising petitioner that it is always preferable to have a lawyer present at such a meeting, Kirk encouraged him to provide the FBI with any information he had regarding terrorism. Kirk also spoke with Puskas after petitioner was taken into INS custody in December 2002. During that conversation, Kirk mentioned the dangers petitioner would face if he was deported to Iran. Although Puskas "seemed to agree," he said the FBI could not help petitioner.

The final witness called by petitioner was Agent Puskas. Puskas testified that he first met petitioner in February 1998 at

Stern's request. At this meeting, which was also attended by an FBI legal advisor, petitioner said he was fearful of returning to Iran and inquired whether the agency could help prevent his deportation. When asked to explain his fears and concerns, petitioner was unable to do so. The legal advisor suggested that petitioner might be an appropriate candidate for asylum. However, upon learning that this would require him to disclose his prior dealings with the FBI, petitioner indicated that asylum was not a viable option.

Puskas next saw petitioner on September 12, 2001, when he appeared at the Oklahoma City FBI office offering to provide information about international terrorism. Petitioner never told Puskas that he had been called by the FBI to come down to the office for an interview. Nor has Puskas been able to find anyone at his office who made such a request. Because of extra security measures instituted in the wake of the September 11 terrorist attacks, petitioner was escorted to the office by agents who were stationed around the perimeter of the building and in the parking lot. Puskas spoke with petitioner for about 30 minutes, at which time petitioner volunteered to assist the United States. Petitioner told Puskas that he served in the Iranian Revolutionary Guard from 1980 to 1983, that his brother is an Iranian military intelligence officer, and that he has friends with access to other Middle Eastern countries, including Lebanon and Syria. He also discussed his immigration problems. Realizing that petitioner had no valuable information at that time, Puskas thanked him for his offer of assistance and told petitioner to call the FBI if he became aware of information regarding

terrorist activities or the funding of terrorism.

According to his notes, Puskas met with petitioner four times over the next 11 months.[8] Each meeting was arranged by petitioner. In fact, Puskas testified that he never initiated any contact with petitioner other than to return his calls. Although petitioner gave Puskas the names and photographs of various Muslims, none of this information concerned potential acts of terrorism or terrorist activities and was insufficient for any investigative purpose. Puskas emphatically denied requesting any information from petitioner or asking him to infiltrate the Oklahoma Shiite Muslim community. Rather, petitioner came forward with all information on his own. After his arrest, petitioner called Puskas several times and left several voice mail messages in February and March 2003. Puskas said that the purpose of these phone calls was to seek assistance from the FBI with his immigration problems. In one telephone call, petitioner allegedly stated that he helped the FBI voluntarily and now wanted assistance in stopping his deportation. Finally, Puskas testified that he has no personal knowledge of any risks or dangers petitioner might face in Iran. However, he admitted that petitioner raised this issue during their initial meeting in 1998 and left several messages following his arrest expressing concern that he would be killed if deported.

**B.**

In order to establish a "state-created danger" as a matter of substantive due process under the Fifth Amendment, petitioner must prove that: (1) the FBI created or increased the danger he faces upon

---

8. These meetings occurred on November 21, 2001, April 10, 2002, August 9, 2002, and August 29, 2002.

his removal to Iran, and (2) that the agents involved acted with deliberate indifference. Petitioner has failed to meet either element of proof.

■ As a preliminary matter, the court observes that petitioner faced no danger until he was ordered removed to Iran in September 1997. Therefore, his informant activities prior to that date are irrelevant to the first prong of this inquiry. Petitioner did not provide any further assistance to the FBI until September 12, 2001, when he allegedly was contacted by an unidentified agent and told to report to the Oklahoma City FBI office. At this meeting, petitioner maintains that he was threatened with deportation unless he agreed to infiltrate the Oklahoma Shiite Muslim community. Agent Puskas denies that he or any other FBI agent contacted petitioner, asked him to infiltrate any Muslim group, or coerced him in any manner. The court finds Puskas' testimony more credible in this regard. In making this determination, the court notes that petitioner was unable to recall the specific details of any of his meetings with Puskas. Rather, his testimony consists primarily of vague recollections, self-serving assertions, and unsubstantiated conclusions. By contrast, Puskas made contemporaneous notes of his meetings with petitioner. As a result, his testimony about what transpired at those meetings and who initiated the contacts is more worthy of belief. The court also notes that petitioner's original pleading makes no mention of any threats or coercion. In fact, the affidavit of Frank Kirk attached to the habeas petition recites that petitioner "willingly" assisted the FBI by reporting on persons attending a local mosque. (*See* Hab. Pet., Exh. A at 1, ¶ 3). The issue of coercion surfaced for the first time in an affidavit submitted by petitioner after the district judge ruled that this was an essential element of his "state-created danger" claim. These factors, along with petitioner's obvious interest in the outcome of the case, lead the court to accept Puskas' version of his dealings with petitioner. Because petitioner voluntarily offered to assist the FBI after September 11, 2001, and was not threatened or coerced in any manner, the federal government did not create or increase any risk of danger he may face upon his removal to Iran.

Nor has petitioner established deliberate indifference on the part of any government actor. During the time petitioner allegedly provided intelligence information on the Oklahoma Shiite Muslim community after September 11, 2001, neither Puskas nor any other FBI agent had actual knowledge that he faced an increased risk of danger should he return to Iran. To the contrary, Puskas testified that he was unaware of any such risk or danger. While petitioner may have expressed vague fears and concerns to Puskas at their initial meeting in 1998 and at various times thereafter, he was never able to explain why he was afraid to return to Iran. This evidence does not rise to the level of "culpable knowledge and conduct" necessary to prove deliberate indifference.[9] Even if

---

9. The other evidence offered by petitioner on the issue of deliberate indifference is equally weak. Visar Belegu testified that he spoke with Agent Stern by telephone following petitioner's arrest in December 2002. In that conversation, Stern allegedly told Belegu that he was worried petitioner might be killed if he was forced to return to Iran. For his part, Stern acknowledged talking with Belegu but denied making any such statement. Petitioner also relies on a surreptitiously tape-recorded conversation between Stern and himself wherein Stern said that he did not want to see "bad things" happen to petitioner. Finally, petitioner testified that he was recently interviewed by an Iranian official who was aware of his efforts on behalf of the United States government. Assuming that any or all of this

Puskas failed to realize the potential danger in allowing petitioner to be deported to his native country after providing intelligence information on Iranian citizens living in the United States, such negligence cannot support a claim under a "state-created danger" theory. *See McClendon,* 305 F.3d at 326 n. 8, *quoting Farmer v. Brennan,* 511 U.S. 825, 838, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994) ("A [government] actor's failure to alleviate 'a significant risk that he should have perceived but did not,' while 'no cause for commendation,' does not rise to the level of deliberate indifference.") *But cf. Builes v. Nye,* 239 F.Supp.2d 518 (M.D.Pa.2003) (finding that government was deliberately indifferent to risks faced by criminal alien who had been ordered deported to Colombia, where specific threats were made against the alien as a result of his involvement as a cooperating witness in drug trafficking investigation and third-parties manifested their ability to carry out those threats by murdering two of his relatives in Colombia); *Rosciano v. Sonchik,* 2002 U.S. Dist. LEXIS 25419 (D.Ariz. Sept. 9, 2002) (similar).

### CONCLUSION

Petitioner has failed to prove that the FBI acted with deliberate indifference in creating or increasing the risk of danger he faces upon his removal to Iran. Consequently, there is no "state-created danger" or substantive due process violation under the Fifth Amendment. Petitioner's application for writ of habeas corpus is denied.

SO ORDERED.

### JUDGMENT

For the reasons stated in the Memorandum Opinion and Order dated June 25, 2003, petitioner's application for writ of habeas corpus is denied. This case is hereby dismissed with prejudice. All costs of court are taxed against petitioner.

SO ORDERED.

---

evidence is even admissible, none of it shows that the FBI knew petitioner would face an increased risk of danger should he return to Iran at the time he allegedly assisted the government by reporting on the activities of Muslims in Oklahoma City.