The **ESTATE OF Ashley Marie POND, Deceased, by and through its Personal Representative, Lori Pond, and Lori Pond, individually, Plaintiffs,**

v.

State of **OREGON, Oregon Department of Human Services; Bobby Mink, individually and as former Director of the Oregon Department of Human Services; Darlene Walsh, individually and in her official capacity; Colin Fitzpatrick, individually and in his official capacity; Clackamas County, a Political Subdivision of the State of Oregon; Clackamas County Sheriff's Office; Pat Detloff, individually and as Sheriff of Clackamas County; The City of Oregon City, a Municipal Corporation; Oregon City Police Department, the Police Agency for the City of Oregon City; and Gordon Huiras, individually and as Chief of Police of Oregon City Police Department, Defendants.**

**No. 04–3003–KI.**

United States District Court, D. Oregon.

June 22, 2004.

Linda G. Beloof, Michael C. Haines, Beloof & Haines, LLP, Oregon City, OR, for Plaintiffs.

Hardy Myers, Attorney General, John Clinton Geil, David L. Kramer, Assistant Attorneys General, Department of Justice, Salem, OR, for Defendants.

## OPINION

KING, District Judge.

On January 9, 2002, Ashley Pond disappeared at the age of twelve. Her remains were found months later buried on Ward Weaver III's rental property. Weaver was arrested and charged with the aggravated murder of Ashley Pond as well as numerous related counts. His trial is currently delayed pending his ability to aid and assist his criminal defense, after treatment at Oregon State Hospital as ordered by the judge presiding over the criminal proceeding.

Plaintiffs, the estate of Ashley Pond and her mother Lori Pond, bring this case against the State of Oregon, Oregon Department of Human Services and three of its employees, Bobby Mink, Darlene Walsh, and Colin Fitzpatrick (collectively, "State Defendants"); Clackamas County and related defendants; and Oregon City and related defendants. Before the court is the State Defendants' Motion for Summary Judgment (# 13). For the reasons below, I dismiss all claims alleged against the State Defendants.

## FACTS

Chris Owen is a Deputy District Attorney in Clackamas County, Oregon, who was prosecuting multiple counts of sexual abuse against Wesley Roettger in August 2001. The victim of that crime was Roettger's biological daughter, Ashley Pond. Roettger's criminal defense attorney told Owen that Ashley Pond had accused a neighbor, Weaver, of sexual abuse. The attorney intended to use this information to defend Roettger by casting doubt on the truth of Ashley Pond's allegations against Roettger.

Owen spoke in person with Lori Pond on August 31, 2001. Lori Pond and her boyfriend, James Keightley, admitted to Owen that they knew that Ashley Pond alleged that Weaver sexually abused her. Lori Pond admitted that she chose not to report the information to law enforcement. Owen drove to a Clackamas County Sheriff's Office and called the DHS Child Abuse Hotline to report the allegations made by Ashley Pond against Weaver. Because Owen made this report after the DHS office was closed for the Labor Day weekend, the report was forwarded from the hotline in Clackamas County to Multnomah County, which was staffed by DHS employees. As a licensed lawyer, Owen is a mandatory reporter of child abuse under ORS 419B.010. The report was that the abuse occurred outside the Pond family home.

On September 4, 2001, Owen and his investigator, Tom Kusturin, met again with Ashley Pond. She told Owen and Kusturin that she was having dreams of being molested and thought the dreams were due to the previous sexual abuse by Roettger.

She then realized that she was not dreaming and it was Weaver who was molesting her. Ashley Pond disclosed three incidents of sexual abuse by Weaver to Owen and Kusturin. Ashley Pond also stated that her mother, Lori Pond, already knew that she had been alleging that Weaver molested her.

Immediately after that interview, Owen and Kusturin had a second interview with Lori Pond, who admitted that she learned of her daughter's allegations against Weaver about two and a half weeks earlier. Lori Pond again stated that she had not reported the allegations to law enforcement authorities.

Darlene Walsh, a supervisor with the Oregon Department of Human Services ("DHS") in the Children, Adults and Family program area, supervised Colin Fitzpatrick, a DHS employee who worked on the Child Abuse Hotline. Walsh reviewed the actions of the Child Abuse Hotline in response to the August 31 and September 5 complaints. She confirms that the August 31 report did not involve allegations of abuse or neglect by anyone in Ashley Pond's family or anyone living in Ashley Pond's home. The August 31 report was that Weaver, a neighbor of the Pond family, allegedly sexually abused Ashley Pond when she was staying at Weaver's house to visit Weaver's daughter.

During August and September 2001, Ashley Pond lived with her mother, Lori Pond. Ashley Pond was not a ward of the state at that time and was not in the physical or legal custody of the state. Also during August and September 2001, Weaver was not on probation or parole and was not in any other way in the custody or control of the State of Oregon. Weaver did not live in the Pond home.

Weaver was arrested for the murder of Ashley Pond and Miranda Gaddis on October 3, 2002.

Bobby Mink was the Director of DHS during the time relevant to this case. DHS has the responsibility to "cross report" any allegations of child abuse to the appropriate local law enforcement authority, such as a local police department or county sheriff's office. DHS cross reported the August 31 report from Owen and the later two reports received a few days later in early September 2001 to law enforcement authorities, including the Clackamas County Sheriff's office, by September 18, 2001. This was 11 working days and 19 calendar days after the receipt of the first report by DHS.

According to Mink, DHS had information that Lori Pond knew of her daughter's allegations against Weaver and would protect her child from any further contact with Weaver if she deemed him a credible threat. DHS classified these type of allegations as third party complaints when: (1) the parent or parents had physical and legal custody of their child; (2) the alleged abuser did not live in the family home and the alleged abuse did not occur in the family home; and (3) the child's parents were aware of the allegations and were taking steps to protect their child. DHS would not seek to remove children from the home of their custodial parents after receiving a third party complaint under the circumstances concerning Ashley Pond. DHS is not a law enforcement agency and does not have the authority to arrest adults or initiate criminal prosecutions.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once

the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.), *cert. denied,* 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999).

## DISCUSSION

Plaintiffs allege three constitutional violations under 42 U.S.C. § 1983, for danger creation, for failure to train, and for unconstitutional customs, policies and practices. Plaintiffs also allege a fourth claim for wrongful death.

### I. *Wrongful Death Claim*

■ The State Defendants note that the Oregon Tort Claims Act requires that the public body be substituted for state employees who are individually named as defendants in a tort claim. ORS 30.265(1). I dismiss the fourth claim for wrongful death alleged against Mink, Walsh, and Fitzpatrick, leaving the State of Oregon as the only State Defendant in that claim.

■ The State of Oregon argues that the Eleventh Amendment protects it from liability for the wrongful death claim. Under the Eleventh Amendment, a state and state agencies are "immune from suit under state or federal law by private parties in federal court absent a valid abrogation of that immunity or an express waiver by the state." *In re Harleston,* 331 F.3d 699 (9th Cir.2003). The Oregon Tort Claims Act is a waiver of sovereign immunity but does not waive Eleventh Amendment immunity. Thus, suits by private parties against the state must be brought in state court. Accordingly, I also dismiss the

fourth claim for wrongful death against the State of Oregon.

### II. *Civil Rights Claims*

The three civil rights claims invoke the Fourteenth Amendment without citing to a particular clause, with the exception of the second claim for failure to train alleging that defendants subjected Ashley Pond to deadly injury and denial of her essential liberties without due process of law. Complaint ¶ 41. The first claim for danger creation alleges a violation of rights under the Fourteenth Amendment for violation of bodily integrity and personal security. The third claim for custom, policies, and practices alleges a violation of the Fourteenth Amendment for failing to promulgate policies for handling third party sexual abuse and failing to immediately respond to sexual abuse reports. I think the fairest reading of the three claims is that all allege variations of substantive due process violations.

The State Defendants contend that the three civil rights claims are precluded by the doctrine set forth in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Four-year-old Joshua DeShaney was beaten by his father so severely that he was expected to spend the rest of his life confined to an institution for the profoundly retarded. Joshua suffered brain damage caused by traumatic head injuries inflicted over a long period of time. The beatings occurred over a two year period during which Joshua's family was closely monitored by the state's Department of Social Services ("DSS") after a report by Joshua's step mother. During this monitoring, emergency room personnel notified DSS after three separate events that Joshua's new wounds were suspected to be caused by child abuse. The fourth hospitalization came after Josh-

ua's father beat him so severely that he fell into a coma. *Id.* at 192–93, 109 S.Ct. 998.

The Court held that, as a general matter, a state's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause. *Id.* at 197, 109 S.Ct. 998.

> It may well be that, by voluntarily undertaking to protect Joshua against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger. . . . But the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation.

*Id.* at 202, 109 S.Ct. 998. The Court affirmed summary judgment granted in the state's favor. *Id.* at 203, 109 S.Ct. 998.

 Two exceptions exist to this general rule. First, under the special relationship exception, when the state takes a person into custody and holds the person against his will, the constitution imposes responsibility for the person's safety and general well-being. *Amos v. City of Page, Arizona,* 257 F.3d 1086, 1090 (9th Cir. 2001). Because Ashley Pond was not physically held by the state in custody, or even a ward of the court, this exception does not apply.

 The second exception, known as the danger creation exception, occurs if the state *affirmatively* places the person in a dangerous situation. The focus is on whether the state left the person in a situation that was more dangerous than the situation in which it found him. *Id.* at 1091. Courts have found § 1983 claims to be stated under the danger creation exception in several cases.

In *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990), an officer arrested the driver of the car in which Wood was a passenger, impounded the car, and told Wood to get out of the car and leave, even though it was a high crime area. Wood was raped while trying to get home.

In *L.W. v. Grubbs,* 974 F.2d 119 (9th Cir.1992), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993), a prison nurse was raped by an inmate who was assigned to work with her alone, even though he was a violent sex offender who had failed all treatment programs at the prison and was considered very likely to commit a violent crime if placed alone with a female. In addition, the nurse was assured when hired that she would not be required to work alone with violent sex offenders so she was not exercising extra care.

In *Penilla v. Huntington,* 115 F.3d 707 (9th Cir.1997), *cert. denied,* 524 U.S. 904, 118 S.Ct. 2059, 141 L.Ed.2d 137 (1998), police responded to a 911 call made by the plaintiff's neighbor to get help for the plaintiff who was lying ill on his front porch. The officers examined the plaintiff and found him in grave need of medical care, canceled the request for paramedics, broke the lock of his front door, moved the plaintiff inside and locked the door, and left.

Finally, in *Munger v. City of Glasgow Police Department,* 227 F.3d 1082 (9th Cir. 2000), officers responded to a call for help with a bar fight. The officers walked the intoxicated plaintiff out of the bar into subfreezing weather when the plaintiff was wearing only jeans and a T-shirt. The officers would not let the plaintiff reenter the bar or drive away in his truck and watched him walk away from nearby open establishments. The plaintiff died from hypothermia that night.

Other cases found that the danger creation exception prevented plaintiffs from stating a constitutional claim. In *Christiansen v. City of Tulsa*, 332 F.3d 1270 (10th Cir.2003), police negotiators were unable to prevent the suicide of a man at the end of a day-long armed standoff. The officers did not create the danger, the man's exposure to his own suicide attempt, and did not increase the man's vulnerability to the danger by use of their tactics during the negotiations.

In *Amos v. City of Page, Arizona*, 257 F.3d 1086 (9th Cir.2001), a driver fled into the desert after an automobile accident and ultimately died before being found. Officers responding at the scene learned that the plaintiff either walked, stumbled, or jogged into the desert. They halted civilian search efforts and followed a blood trail for a while before cutting short their search due to failing flashlights. Likewise, a helicopter quickly abandoned its search efforts due to concerns about nearby power lines. The department's informal policy was not to conduct a thorough search for runaway drivers because many Native Americans in car accidents in the area would leave the scene, flee to the reservation, and make a police report the next day that their car was stolen. The court held that the officers did not create the danger because they arrived after the plaintiff fled into the desert. *Id.* at 1091. The court also held that the officers did not create a danger when they stopped the civilian rescue efforts and rather quickly called off the official rescue efforts. According to the court, the civilian efforts were minimal and any incompetence demonstrated in the officers' efforts did not rise to a constitutional level. *Id.* at 1092.

As these cases demonstrate, the danger creation exception requires affirmative conduct on the part of the State Defendants to worsen Ashley Pond's situation once the state received the first report of child abuse by Weaver on August 31. Once the state received the first report, there was an unexplained delay of a couple of weeks in reporting the allegations to law enforcement. Although the state did not increase the level of Ashley's Pond's safety, it also did not decrease it. During the state's delay in reporting the abuse allegations to law enforcement, Ashley Pond remained in exactly the same situation—in her mother's care while her mother was aware of Ashley's allegations. The State Defendants argue that DHS is not a law enforcement agency and is not authorized to arrest and prosecute Weaver. Although this is true, the issue is more correctly stated as whether DHS took appropriate actions to protect a child when it learned that her mother had not reported the child's allegations of sex abuse to anyone for more than two weeks. That question, however, is not a matter for this court.

Based on *DeShaney*, the State Defendants did not violate the Constitution. I grant summary judgment in favor of the State Defendants against the three § 1983 claims.

## CONCLUSION

State Defendants' Motion for Summary Judgment (# 13) is granted. All claims against the State Defendants are dismissed.