# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 23, 2019

No. 18-60081

Lyle W. Cayce
Clerk

ELEANOR KELLER, individually and on behalf of all Heirs-at-Law and/or wrongful death beneficiaries of Gerald Simpson, Deceased; THE ESTATE OF GERALD SIMPSON, by and through Glen Simpson, Administrator of Estate,

Plaintiffs - Appellees

v.

DARRIN FLEMING,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Mississippi

Before STEWART, Chief Judge, and DENNIS and WILLETT, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

We review the district court's denial of an officer's motion for summary judgment based on qualified immunity. Plaintiffs' decedent, Gerald Simpson, was struck and killed by a motor vehicle as he walked along a Mississippi highway in darkness; Simpson had been dropped off on the highway at the county line by Deputy Darrin Fleming of the Attala County Sheriff's Department. Plaintiffs, members of Simpson's family and his estate, sued the County of Attala and the City of Kosciusko, Mississippi, and law enforcement officials, alleging state law claims and Fourth and Fourteenth Amendment deprivations under 42 U.S.C. § 1983. The district court granted summary

## No. 18-60081

judgment to the City of Kosciusko and its officers but denied summary judgment to Attala County and Deputy Fleming. *See Keller v. Attala County*, No. 1:16-CV-136-SA-DAS, 2018 WL 615681 (N.D. Miss. Jan. 29, 2018). Deputy Fleming filed this interlocutory appeal, contending he is entitled to summary judgment based on his claim of qualified immunity. We AFFIRM the district court's judgment as to the Fourth Amendment claim, REVERSE as to the Fourteenth Amendment claim, and RENDER judgment.

## I

On the afternoon of January 26, 2015, Gerald Simpson was walking in the middle of Highway 12 in Kosciusko, Mississippi, eating from a box of chicken.[1] Kosciusko police officers responded to a dispatch call reporting Simpson's activity. By the time Kosciusko Officer Steve Allan arrived, Simpson had walked beyond the Kosciusko city limits and into Attala County. Officer Allan stopped Simpson and alerted the Attala County Sheriff's Department. While waiting for its Sheriff's deputy to arrive, Officer Allan questioned Simpson and discovered that Simpson could not speak coherently but kept pointing westward down the highway. Kosciusko Police Officer Maurice Hawthorne arrived and replaced Officer Allan, who left to respond to another call.

When Simpson tried to walk down the highway again, Officer Hawthorne persuaded him to stop and sit in the backseat of his patrol car. Simpson sat in the backseat of the vehicle with his feet on the ground and the door open until Attala County Sheriff's Deputy Darrin Fleming arrived. Both

---

[1] As we explain below, our review is based on the facts the district court accepted as sufficient to deny summary judgment. *See Keller*, 2018 WL 615681 at \*1, \*5; *Cantrell v. City of Murphy*, 666 F.3d 911, 922 (5th Cir. 2012) ("When considering an appeal from the denial of qualified immunity . . . our inquiry concerns the purely legal question of whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record.").

officers acknowledged that Simpson's speech was still unintelligible. At this point, the officers allegedly decided that Simpson should be taken to his residence. The district court found a genuine dispute of fact about Deputy Fleming's motive in providing a ride to Simpson. Deputy Fleming alleged that he "merely wished to assist Simpson by providing a courtesy ride home." By contrast, Plaintiffs alleged that Deputy Fleming acted pursuant to an Attala County custom of picking up those viewed as vagrants and dropping them off in neighboring jurisdictions to rid the county of vagrants. Deputy Fleming put Simpson in the backseat of his vehicle and asked him where he resided, but Simpson was unable to articulate where he lived and merely pointed west on Highway 12, in the direction of Durant, Mississippi. Deputy Fleming drove Simpson several miles in that direction, but throughout the ride, Deputy Fleming did not ask for Simpson's address or identification card, and Simpson did not identify his residence. Upon reaching the Attala County line sometime after 5:00 p.m., Deputy Fleming pulled over and opened the back door of his patrol vehicle. Simpson exited the vehicle and continued walking toward Durant on County Road 4101, outside of Attala County's jurisdiction. There was barely enough daylight to see a person walking, but it was not yet dark. Later that evening, after dark, a motorist struck and killed Simpson as he was walking east on the roadway back toward Kosciusko.

The officers testified that they were aware Simpson's behavior was strange and Simpson's speech was incoherent. The officers were not aware that Simpson had recently been released from a state hospital after twelve years of confinement for certain developmental disabilities, including a speech impediment. On the day he was killed, Simpson had wandered away from his sister's home in Attala County, approximately seventeen miles from the location where Fleming ultimately dropped him.

No. 18-60081

Plaintiffs[2] sued the City of Kosciusko, Officers Allan and Hawthorne, Attala County, and Deputy Fleming under 42 U.S.C. § 1983, alleging violations of the Fourth Amendment and the substantive due process clause of the Fourteenth Amendment. Plaintiffs also brought state law claims. Defendants moved for summary judgment. The district court granted summary judgment in favor of the City of Kosciusko and Officers Allan and Hawthorne.[3] However, the district court denied Attala County's and Deputy Fleming's motion in part, finding that genuine issues of material fact existed as to Plaintiffs' constitutional claims. Deputy Fleming appeals from the district court's order denying him qualified immunity.[4]

## II

First, we must address our jurisdiction to hear Deputy Fleming's interlocutory appeal. "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). This is so because qualified immunity "is an *immunity from suit* rather than a mere defense to liability . . . [and] it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 526. However, our jurisdiction over such appeals is "significantly limited," and exists only if the district court's "denial

---

[2] Plaintiffs are Simpson's estate and Eleanor Keller (Simpson's sister), individually and on behalf of other members of Simpson's family.

[3] The district court held that the City officers did not violate Simpson's Fourth Amendment rights and that, assuming the officers seized Simpson, they had reasonable cause to retrieve him from the middle of the highway pursuant to their community caregiver function. *See Keller*, 2018 WL 615681, at *8. The district court further held that there was no Fourteenth Amendment violation because the City officers did not confine Simpson against his will and therefore no special relationship was created. *See id.* Plaintiffs' claims against the City officers are not the subject of this interlocutory appeal.

[4] Attala County did not file an interlocutory appeal from the district court's order.

4

of summary judgment turns on an issue of law." *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc) (cleaned up).

When a district court denies a "motion for summary judgment predicated upon qualified immunity," the district court makes two distinct determinations, at least implicitly. *Id.* "First, the district court decides that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law. Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Id.* We have jurisdiction over the first type of determination, but not the second. *Id.* at 346–47. In other words, we can review factual disputes for materiality, but not for genuineness. *See Wagner v. Bay City, Tex.*, 227 F.3d 316, 320 (5th Cir. 2000). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell,* 149 F.2d 335, 337 (5th Cir. 1945)). "Where factual disputes exist in an interlocutory appeal asserting qualified immunity, we accept the plaintiff's version of the facts as true." *Juarez v. Aguilar*, 666 F.3d 325, 331–32 (5th Cir. 2011) (quoting *Kinney*, 367 F.3d at 348) (cleaned up). In reviewing the denial of a defendant's claim of immunity, we "need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim." *Mitchell*, 472 U.S. at 528. Instead, we need

only determine "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Id.*

### III

When a defendant invokes the defense of qualified immunity, the burden is on the plaintiff to demonstrate its inapplicability. *See McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). To overcome qualified immunity, the plaintiff must show that (1) there was a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of the defendant's conduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (discussing the framework set forth in *Saucier v. Katz*, 533 U.S. 194 (2001)). We discuss Plaintiffs' Fourth and Fourteenth Amendment claims in turn.

### A

### 1

We first consider Plaintiffs' claim that Deputy Fleming's seizure of Simpson violated Simpson's Fourth Amendment rights. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). "A person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). This occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554. The Fourth Amendment generally prohibits an officer from seizing and detaining an individual without "probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an

offense.'" *See Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)). However, in *Terry v. Ohio*, the Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22. We have also recognized that police engage in a wide variety of activities unrelated to the investigation and prosecution of crime and that seizures for these purposes may not be unreasonable. *See United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (en banc) (holding that an officer acted upon reasonable suspicion in detaining a man wearing dark clothing who was standing in the road and appeared drunk (citing *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973) (describing the "community caretaking functions" that police officers serve))).

In denying Deputy Fleming qualified immunity on Plaintiffs' Fourth Amendment claim, the district court determined that there were several genuine issues of material fact: (1) whether Deputy Fleming merely wished to give Simpson a courtesy ride home (as Deputy Fleming alleged), or whether Deputy Fleming acted pursuant to an Attala County custom of picking up vagrants and dropping them off in neighboring jurisdictions (as Plaintiffs alleged); (2) whether Deputy Fleming was fulfilling a "community caretaker" role and, if so, whether he eventually ceased acting in this role during the encounter; (3) whether Simpson felt as though he was free to leave; and (4) whether Simpson was capable of giving his consent to be seized in the first place. *See Keller,* 2018 WL 615681 at *5–6. In this interlocutory appeal, we are limited to assessing whether the district court erred in deeming these factual disputes material and in concluding as a matter of law that Deputy Fleming was not entitled to qualified immunity. *See Kinney*, 367 F.3d at 347.

No. 18-60081

Assuming Plaintiffs' allegations to be true, as we must, *see Juarez*, 666 F.3d at 331–32, we conclude that a reasonable person in Simpson's position would not have felt free to leave.[5] *See Mendenhall*, 446 U.S. at 554. According to Plaintiffs' allegations, Deputy Fleming placed Simpson in his vehicle and drove several miles down the highway; Simpson did not consent to be transported by Deputy Fleming; and during the drive, Deputy Fleming did not ask for Simpson's address or identification card and did not stop or allow Simpson to exit the vehicle until they reached the county line. Plaintiffs have thus raised a genuine issue of material fact as to whether Deputy Fleming seized and detained Simpson. *See id.*

We next examine whether Deputy Fleming's alleged seizure of Simpson was reasonable. When Kosciusko Officer Allan stopped Simpson, he was walking in the middle of the highway in Kosciusko while eating chicken. The district court concluded that, "[e]ven if the City officers did 'seize' [Simpson], it was clearly a reasonable seizure, performed pursuant to the community caregiver function." *See Keller*, 2018 WL 615681, at *8. The City officers did not formally arrest or charge Simpson; instead, they called the County Sheriff's office for assistance. Deputy Fleming's subsequent actions in placing Simpson

---

[5] Deputy Fleming contends that the district court erred by considering Simpson's subjective understanding of the encounter. Under the Fourth Amendment, the inquiry into whether a seizure has occurred must be objective—that is, whether "a reasonable person would have believed that he was not free to leave." *See Mendenhall*, 446 U.S. at 554. And although Plaintiffs allege Simpson had intellectual disabilities, the Fourth Amendment's "reasonable person" standard does not accommodate such considerations. *See Carroll v. Ellington*, 800 F.3d 154, 170–71 (5th Cir. 2015) (applying the "reasonable person" standard to analyze whether officers seized the decedent, who was mentally ill). Here, the district court appears to have cited the objective standard in laying out the relevant Fourth Amendment framework, but then proceeded to find that it "[was] questionable . . . whether Simpson ever felt as though he was free to leave." Even if the district court's subjective formulation was merely imprecise wording, we now clarify that Deputy Fleming is correct that only the objective question of whether a reasonable person would have felt free to leave is relevant to the Fourth Amendment inquiry.

in his vehicle and transporting him to the county line constituted a separate "intrusion" that we must also analyze for reasonableness.[6] Deputy Fleming does not contend that his seizure of Simpson was a Terry stop or that he reasonably suspected or had probable cause to believe that Simpson was guilty of criminal activity. Instead, Deputy Fleming avers that he was merely helping Simpson find his way home.[7]

Construing the facts in Plaintiffs' favor—that is, that Fleming seized, detained, and transported Simpson to the next county pursuant to Attala County's custom of vagrant dumping—and examining the reasonableness of Deputy Fleming's actions in light of the Supreme Court's jurisprudence on vagrancy and related stop-and-identify laws, we conclude that Deputy Fleming violated Simpson's Fourth Amendment rights. In *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972), the Supreme Court invalidated a city ordinance criminalizing archaic classifications of vagrancy as void for

---

[6] *See Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (analyzing the reasonableness of a traffic stop based on a violation of the Pennsylvania Motor Vehicle Code separately from the reasonableness of the "incremental intrusion resulting from" an officer's order to the occupant to get out of the car); *see also United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) (analyzing an initial *Terry* stop separately from an officer's subsequent decision to transport plaintiff to a crime scene).

[7] Deputy Fleming argues that the district court's consideration of his motive in giving Simpson a ride was improper and that Plaintiffs offered no evidence to support the allegation that he was acting pursuant to a custom of getting rid of vagrants. His arguments are unavailing for two reasons. First, we do not have jurisdiction in this interlocutory appeal to consider whether Plaintiffs' allegations are sufficient. *See Mitchell*, 472 U.S. at 528 (on appeal from the denial of qualified immunity, courts "need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim"). Instead, we are confined to assessing the materiality of any fact disputes the district court determined were genuine. *See Wagner*, 227 F.3d at 320. Additionally, as explained below, the district court's consideration of whether Deputy Fleming transported Simpson for the purpose of ridding Attala County of vagrants, or pursuant to fulfilling a community caretaking role (such as giving Simpson a ride home), is material because it bears on the reasonableness of his actions and could therefore affect the outcome of the suit. *See Anderson*, 477 U.S. at 248; *Rideau*, 969 F.2d at 1574. The district court did not err by deeming this factual dispute material. *See Kinney*, 367 F.3d at 347–348.

vagueness, both for failure to give fair notice of forbidden conduct and because the ordinance encouraged arbitrary and erratic arrests and convictions. Attala County's alleged unwritten anti-vagrancy custom, under which Deputy Fleming acted, likewise failed to give notice and encouraged arbitrary and erratic seizures.

The Supreme Court has also examined the constitutionality of stop-and-identify statutes, which "permit an officer to ask or require a suspect to disclose his identity." *See Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 183 (2004) (noting that these laws "often combine elements of traditional vagrancy laws with provisions intended to regulate police behavior in the course of investigatory stops") (internal citations omitted). In *Brown v. Texas*, the Supreme Court held that a conviction for violating a Texas stop-and-identify statute violated the Fourth Amendment where the initial stop was not "based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *See* 443 U.S. 47, 51 (1979). Later, in *Hiibel*, the Supreme Court upheld a conviction under a Nevada stop-and-identify statute, reaffirming *Brown* but distinguishing it on the basis that the officer had reasonable suspicion to initially stop Hiibel, "satisfying the Fourth Amendment requirements noted in *Brown*." 542 U.S. at 184. The Court explained that "[o]btaining a suspect's name in the course of a *Terry* stop serve[d] important government interests" that were not outweighed by the intrusion on the suspect's Fourth Amendment interests. *See id.* at 186–88.

In light of *Papachristou*, *Brown*, and *Hiibel*, we conclude that Deputy Fleming's subsequent seizure and detention of Simpson violated Simpson's Fourth Amendment rights. Taking Plaintiffs' facts as true, Deputy Fleming

No. 18-60081

placed Simpson in his patrol car and transported him to the Attala County line to rid the county of vagrants. The seizure was not for *Terry* stop purposes and was significantly more intrusive than a brief detention for identification or investigatory purposes. *See Hiibel*, 542 U.S. at 183; *Brown*, 443 U.S. at 51; *Papachristou*, 405 U.S. at 170. According to Plaintiffs' alleged facts, Deputy Fleming's actions were based on an unwritten county custom and not "on objective criteria," leaving Simpson vulnerable to Deputy Fleming's unfettered discretion. *See Brown*, 443 U.S. at 52. On the material facts the district court deemed sufficient to deny summary judgment, and viewed in the light most favorable to Plaintiffs, Deputy Fleming's seizure, detention, and transporting of Simpson at the county line for alleged vagrant-ouster purposes violated the Fourth Amendment.[8]

## 2

We must now determine whether Simpson's Fourth Amendment right was clearly established. The district court held that, "[i]n taking Plaintiffs' allegations as true, that Defendants wanted to remove Simpson from their

---

[8] To the extent that Deputy Fleming acted as a "community caretaker," his initial seizure of Simpson and his decision to transport him away from where he was walking in the middle of the highway could arguably have advanced the public interest. *See Brown*, 443 U.S. at 51–52. However, his decision to seize, transport, and merely drop Simpson off further down the rural highway as darkness approached did not increase the public's or Simpson's security. Moreover, Deputy Fleming's seizure of Simpson severely interfered with Simpson's liberty. In *Kovacic v. Villareal*, we determined that the officers' actions in giving the drunk plaintiff a courtesy ride to a 24-hour, lighted gas station at the plaintiff's request were not unreasonable. 628 F.3d 209, 212, 214–15 (5th Cir. 2010). Although a Fourteenth Amendment (and not a Fourth Amendment) case, the facts of *Kovacic* help illustrate that Deputy Fleming's actions, unlike those of the officers in *Kovacic,* were unreasonable. Here, Simpson did not ask Deputy Fleming for a ride. Deputy Fleming failed to ask for Simpson's address or identification card to properly identify his home address. Moreover, though Deputy Fleming testified that Attala County officers sometimes took individuals to a hospital or arranged for pick-ups by officers outside of the jurisdiction, he did not do so with Simpson. Instead, he abandoned Simpson on the side of the road in a remote area at dusk, did not ensure that Simpson had access to a phone or a means to secure another way home, and did not call officials from the next county for assistance.

11

jurisdiction as a means to rid themselves of a vagrancy problem, it cannot be said that Deputy Fleming did not understand that what he was doing violated the law." Qualified immunity works "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful," *Saucier*, 533 U.S. 194, 206 (2001), and protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs,* 475 U.S. 335, 341 (1986). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). A right may be clearly established, even in novel factual circumstances, where a defendant's conduct clearly and obviously violates the Constitution. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The "salient question" is not whether there are previous cases with facts that are "fundamentally similar," but rather, "whether the state of the law [at the time of defendants' conduct] gave [them] fair warning that [plaintiff's] alleged treatment was unconstitutional." *Id.*

At the time the incident at issue here occurred, Supreme Court precedent provided clear notice that "the reasonableness of a seizure under the Fourth Amendment is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." *Hiibel*, 542 U.S. at 187–88 (internal quotations omitted); *see also Brown*, 443 U.S. at 50–51 (internal quotations omitted). This balance ensures "that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown*, 443 U.S. at 51 (citing *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)). Under Plaintiffs' version of the facts, Deputy Fleming's seizure, detention, and

transporting of Simpson to the Attala County line did not serve a legitimate government interest. *Compare Papachristou*, 405 U.S. at 171 (criminalizing vagrancy on "[a] presumption that people who might walk or loaf or loiter or stroll . . . or who look suspicious to the police are to become future criminals is too precarious for a rule of law"), *with Meehan v. Thompson*, 763 F.3d 936, 943 (8th Cir. 2014) (transporting an intoxicated passenger to a detox facility was reasonable), and *United States v. McCargo*, 464 F.3d 192, 199 (2d Cir. 2006) (transporting a suspect a short distance to a crime scene was "in furtherance of a legitimate law-enforcement purpose" and not unreasonable). On the other side of the scale, the decision to seize Simpson and dump him in the next jurisdiction without his consent based on a vagrant-ouster custom severely intruded on his right to personal security. *See Hiibel*, 542 U.S. at 187–88 (discussing the balance between the government's interests and the individual's Fourth Amendment interests). With a balance so one-sidedly contrary to an individual's Fourth Amendment rights, every reasonable officer would have understood that seizing Simpson under these circumstances was arbitrary and unreasonable. *See Al-Kidd*, 563 U.S. at 741.

Moreover, precedent from the Supreme Court provided notice when these events occurred that a law designed to provide officers with "unfettered discretion" to arrest persons as vagrants merely on suspicion of future criminality is impermissibly vague. *See Papachristou*, 405 U.S. at 163, 168 (invalidating a vagrancy law that criminalized, inter alia, "common night walkers" or "habitual wanderer[s]" and persons "habitually living without visible means of support"); *Kolender v. Lawson,* 461 U.S. 352, 361 (1983) (invalidating a stop-and-identify statute as unconstitutionally vague "because it encourage[d] arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute"). Given

the Supreme Court's well-established jurisprudence limiting an officer's unfettered discretion to act pursuant to an established vagrancy or vagrancy-related law, it would have been clear and obvious to every reasonable officer in Deputy Fleming's position that arbitrarily seizing Simpson pursuant to an *unwritten* custom of ousting vagrants violated Simpson's Fourth Amendment rights. *See Hope*, 536 U.S. at 741. We therefore conclude that, on Plaintiffs' facts, Deputy Fleming violated Simpson's clearly established Fourth Amendment rights. Accordingly, we affirm the district court's denial of summary judgment based on qualified immunity.

## B

The district court next held that Deputy Fleming was not entitled to summary judgment and qualified immunity on Plaintiffs' Fourteenth Amendment claim, finding several genuine issues of fact: (1) whether Deputy Fleming, by his affirmative act and pursuant to his own will, effectively used his power to force a "special relationship," taking away Simpson's liberty under terms that provided no realistic means of terminating the State's custody, and which deprived Simpson of the ability or opportunity to provide for his own care and safety; (2) whether Deputy Fleming owed Simpson a duty of care; (3) whether, in breaching that duty, Deputy Fleming was deliberately indifferent to Simpson's plight, and (4) whether Deputy Fleming's breach actually caused Simpson's death.

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. As a general matter, a State does not have an affirmative duty to protect an individual from violence by private actors. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). However, the Supreme Court in *DeShaney* recognized that, in very limited circumstances, the State's actions in taking a person into custody and holding

No. 18-60081

him there against his will creates a "special relationship," "impos[ing] upon [the State] a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200. It is the state-imposed limitation on an individual's freedom to act on his own behalf that triggers an affirmative duty to protect—not knowledge of the individual's predicament or a State's expressions of intent to help him. *Id.* The Supreme Court has expressly recognized that a "special relationship" exists between the State and prisoners, *Estelle v. Gamble,* 429 U.S. 97, 103–04 (1976), involuntarily committed mental patients, *Youngberg v. Romeo,* 457 U.S. 307, 315–16 (1982), and suspected criminals injured while being apprehended by police, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

The district court acknowledged that Deputy Fleming's relationship with Simpson did "not neatly fit into" any of these recognized exceptions because Simpson was not incarcerated or involuntarily committed. However, the court likened Simpson's situation to that of an incarcerated person, explaining that, because "Simpson was unable 'by reason of the deprivation of his liberty [to] care for himself,'" it was "only just that the State be required to care for him." Even if the district court correctly found genuine issues of fact regarding the existence of a "special relationship," Plaintiffs must show that Simpson's Fourteenth Amendment right was clearly established at the time of the alleged violation. The district court concluded that Simpson's right was clearly established by *Walton v. Alexander*, 44 F.3d 1297, 1299 (5th Cir. 1995) (en banc). In *Walton*, this court acknowledged that "a very narrow class of persons who stand in a 'special relationship' with the state enjoys a clearly established constitutional right to some degree of state protection from known threats of harm by private actors." 44 F.3d at 1299. But *Walton* explains that "this 'special relationship' only arises when a person is involuntarily confined or

15

otherwise restrained against his will pursuant to a governmental order or by the affirmative exercise of state power." *See id.*

Deputy Fleming argues that the law does not clearly establish that a special relationship would have existed under the facts of this case. We agree. Simpson was killed by a third-party motorist later in the evening after Deputy Fleming dropped him at the county line. In *DeShaney*, the Supreme Court held that state officials had no duty to protect a child who was not in state custody at the time he was injured by his father. *See* 489 U.S. at 201. The Court explained: "That the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *Id.* Some courts have interpreted this language in *Deshaney* as creating a second exception to "the rule against state liability for violence committed by private actors in situations where the state actor played an affirmative role in creating or exacerbating a dangerous situation that led to the individual's injury." *See Kovacic*, 628 F.3d at 214 (discussing *Davis v. Brady*, 143 F.3d 1021 (6th Cir. 1998) (which held that officers violated a man's substantive due process rights by placing him at risk of harm when they abandoned him in an inebriated condition on an unfamiliar highway against his will)). But the Fifth Circuit has never recognized this "state-created-danger" exception. *See id.* (concluding that the law did not clearly establish state actors could be liable for private harm to an individual after his release from custody).

Plaintiffs have not demonstrated a clearly established substantive due process right on the facts they allege. Accordingly, we reverse the district court's denial of summary judgment and render a judgment that Deputy

Fleming is entitled to qualified immunity on the Plaintiffs' Fourteenth Amendment claim.

***

For these reasons, we AFFIRM the district court's judgment denying Deputy Fleming qualified immunity from Plaintiffs' Fourth Amendment claim and REVERSE and RENDER judgment granting him qualified immunity from Plaintiffs' Fourteenth Amendment claim.